Jacob **FREEMAN**, Bernard S. **Brown**, and Robert L. **Garner**, Plaintiffs–Appellees,

v.

**NATIONAL BROADCASTING COMPANY, INC.**, Defendant–Appellant.

No. 43, Docket 94–9301.

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1995.

Decided April 2, 1996.

---

Mark S. Dichter, Philadelphia, Pennsylvania (Wayne D. Rutman, Philadelphia, Penn-

sylvania, and Susan E. Weiner, New York City), for Defendant–Appellant.

Robert L. Garner, Leonia, New Jersey (Jacob Freeman, Ridgewood, New Jersey, and Bernard S. Brown, Englewood Cliffs, New Jersey), Plaintiffs–Appellees Pro Se.

John G. Kester, Washington, D.C. (Thomas G. Hentoff, Washington, D.C., John F. Sturm, Washington, D.C., Rene P. Milam, Reston, Virginia, Ralph Huber, New York City, Michael J. McCarthy, Dallas, Texas, Harold W. Fuson, Jr., La Jolla, California, Judith L. Fanshaw, La Jolla, California, John B. Jaske, Arlington, Virginia, Donald R. Crews, San Antonio, Texas, Jonathan E. Thackeray, New York City, Francis A. McAnaney, Jr., New York City, George Freeman, New York City, Peter G. Stone, Campbell Hall, New York City, Michael Doody, Stamford, Connecticut, and Mary Ann Werner, Washington, D.C., Jane E. Genster, Washington, D.C.), Amicus Curiae.

Neal D. Mollen, Washington, D.C. (Zachary D. Fasman, Washington, D.C., Jay Morrison, Washington, D.C., Henry L. Baumann, Washington, D.C., Steven Bookshester, Washington, D.C., Terry L. Etter, Washington, D.C., Jeffrey S. Rosen, New York City, E. Patrick McDermott, New York City, Mark Engstrom, New York City, and Ginger McRae, Atlanta, Georgia), Amicus Curiae.

Before: MESKILL, MAHONEY, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Defendant-appellant National Broadcasting Company, Inc. ("NBC") appeals from a judgment of the United States District Court for the Southern District of New York (Kathleen A. Roberts, *Magistrate Judge* ) ordering that NBC pay overtime to plaintiffs-appellees, all of whom were employed by NBC or its New York flagship station, WNBC, as television news writers, editors, producers, or field producers at the rate specified under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Because the magistrate judge erred by rejecting NBC's claim that these journalists were "artistic" professionals and thus exempt from the overtime provisions of the FLSA, we reverse.

## BACKGROUND

The facts of this case are carefully set forth by the magistrate judge in *Freeman v. National Broadcasting Co.*, 846 F.Supp. 1109 (S.D.N.Y.1993). We reiterate only those facts necessary to the disposition of the appeal.

On April 30, 1985, 149 employees of the news division of NBC filed a suit seeking recovery under the FLSA of additional back overtime pay. During the lengthy pre-trial period, most of the original plaintiffs either settled with NBC, voluntarily withdrew their claims with prejudice, or were otherwise dismissed from the lawsuit. After the district court denied cross-motions for summary judgment, the remaining plaintiffs and NBC waived their right to a jury trial and consented to trial before the magistrate judge pursuant to 28 U.S.C. § 636(c). The parties further agreed to treat the outcome of the actions of plaintiffs-appellees—news writer Jacob Freeman, producer Bernard Brown, and field producer Robert Garner—as determinative of NBC's liability to all of its news division employees seeking overtime compensation.

During the period relevant to this action, the three plaintiffs each received a weekly base pay of $895 plus certain fees pursuant to their collective bargaining agreement ("CBA") between their union and NBC. *Freeman*, 846 F.Supp. at 1111. Under the CBA, plaintiffs were entitled to overtime pay, calculated at one and one-half times their usual hourly compensation, for time worked in excess of forty hours per week. NBC determined plaintiffs' overtime pay based on the hourly equivalent of their base pay alone. The question raised by this appeal is whether the district court properly concluded that plaintiffs are further entitled to the incremental overtime pay equal to the difference between the overtime pay they have already received pursuant to their CBA and the overtime pay amount provided for by the FLSA, which is based upon an hourly rate that

includes both fees and base pay.[1] Plaintiffs contend that they are covered by the FLSA and that their fees therefore should also have been included in the "regular rate" from which their overtime pay is calculated. *See* 29 U.S.C. § 207(e) ("regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee").

At trial, Freeman, Brown, and Garner as well as other witnesses testified to the job responsibilities of the three plaintiffs. During the period in issue, plaintiff Freeman was the domestic news writer for *Nightly News* and was responsible for coordinating coverage of all the United States-sourced news, save that emanating from Washington, D.C. Freeman would write approximately one-third of each *Nightly News* broadcast. His writing included headlines, teasers, transitions, voice-overs, lead-ins, and stories to be read by the anchor. Freeman was one of only two news writers assigned to *Nightly News;* his counterpart primarily handled foreign news. The news writer positions on NBC's *Nightly News* are among the most highly coveted jobs in broadcast journalism, the pinnacle of the profession.

Freeman was also a member of a core editorial/production group based at NBC's New York headquarters. In addition to the foreign and domestic news writers, the group consisted of the executive producer, senior producer, foreign and domestic producers, news editor, and Tom Brokaw, the program's anchor and managing editor. Throughout each day, Freeman participated in meetings with the other members of the group and reviewed newspapers, wire services, and desk logs to stay abreast of the day's news. Freeman was provided with a "blueprint" of the day's newscast that included the subject and the piece's anticipated format, length, and position in the broadcast. As testified at trial by Executive Producer Wheatley, Freeman generally developed the scripts without further guidance from other staff members in working to "create something of a synergy on the words and pictures to tell the story."

Plaintiff Brown was the domestic producer for *Weekend Nightly News*. This program has substantially the same organizational structure as *Nightly News* but is staffed with different individuals. As a producer, Brown was one of a handful of persons responsible for putting together and airing the *Weekend Nightly News* program. Brown's major responsibilities included the generation of domestic story ideas for the program; the development, oversight, and approval of domestic stories put together in the field by correspondents and field producers; and the coordination and editing of these stories. Brown also reviewed, edited, and approved each story's script. In addition, he would write and produce a special program segment called "Last Week."

Plaintiff Garner was a field producer for the news division of WNBC–TV, NBC's wholly-owned and operated flagship station serving the New York metropolitan area. Garner covered news and feature stories for WNBC in the field, often with the assistance of a camera crew and, frequently, an on-air reporter. Garner would gather, develop, shoot, write, and edit news stories. He directed the camera crew and exercised his judgment as to who was to be interviewed, whether the interview was on-camera, the questions to be asked, and the visual elements to be videotaped. Garner exercised editorial control over the news stories he produced; he researched facts, developed story elements, interviewed subjects, wrote the script, and supervised the editing of the videotape. At the studio, Garner created segments suitable for airing on WNBC's local news program.

At the conclusion of trial, the district court issued a written opinion and order holding that Freeman, Brown, and Garner qualified for neither the professional nor the administrative exemption from FLSA coverage and that they were therefore entitled to have their fees included in their base pay for overtime purposes. The parties thereafter reached an agreement as to damages, and on November 25, 1994, the district court entered a final judgment in favor of plaintiffs. NBC appeals.

---

1. The issue was eliminated in plaintiffs' new CBA which includes fees in plaintiffs' base pay for purposes of calculating overtime. *Freeman,* 846 F.Supp. at 1111 n. 2.

## DISCUSSION

■ The CBA in effect at the time this lawsuit was commenced provided for overtime at one and one-half times plaintiffs' base salary. The FLSA, in addition to requiring overtime, requires that the compensation rate from which overtime is calculated include fees as well as base pay. Therefore, while this discussion necessarily addresses the applicability of the FLSA's overtime provisions generally, the more limited consequence of our holding in this case concerns whether plaintiffs' overtime pay should be based upon their receipt of fees in addition to base pay.

The overtime provisions of the FLSA establish the general rule that employees must be compensated at a rate not less than one and one-half times their "regular rate" for all overtime hours. 29 U.S.C. § 207(a)(1). Congress has expressly exempted persons "employed in a bona fide executive, administrative, or professional capacity" from the FLSA's overtime requirements. 29 U.S.C. § 213(a)(1). NBC argues, as it did in the district court, that the plaintiff journalists are exempt from the overtime provisions as "professional" employees and that they are therefore entitled to overtime pay calculated from their base pay alone, as provided for in their CBA, to the exclusion of their additional fees. We agree.

■ Under the FLSA, the employer bears the burden of proving that the plaintiffs-employees fall within the "artistic" professional exemption. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2d Cir.1991), *cert. denied,* 506 U.S. 905, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). While we may not disturb the district court's factual findings as to the nature of the plaintiffs' employment absent clear error, we review *de novo* the correctness of the trial court's ultimate conclusion that the plaintiffs are not exempt journalists. *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986) (whether employees' "particular activities excluded them from the overtime benefits of the FLSA is a question of law"); *Reich v. New York,* 3 F.3d 581, 587 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994).

■ The FLSA does not define the term "professional" for the purposes of exemption, but directs the Secretary of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The Secretary's regulations have the force of law, *United States v. Nixon,* 418 U.S. 683, 695, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974), and are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute, *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). The pertinent Department of Labor ("DOL") regulation, which applies to employees who earn more than $250 per week, is known as the "short test" (as contrasted with the inapplicable "long test" discussed *infra*). The short test reads as follows:

> *Provided further,* [t]hat an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week . . . exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance either of work [as a learned professional, as a teacher, or as a skilled worker in the computer software field], which includes work requiring the consistent exercise of discretion and judgment, or of work requiring invention, imagination, or talent in a recognized field of artistic endeavor, shall be deemed [exempt from the FLSA overtime pay requirements].

29 C.F.R. § 541.3(e).

Applying the district court's factual findings to the above standard, we hold that the plaintiffs' work entails a sufficient degree of creativity to qualify them under the short test as employees whose primary duty consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor. The trial court found not only that "plaintiffs are 'talented' in the sense that they have a native and superior ability in their fields," but also that "on occasion, plaintiffs' work is inventive and imaginative, and may demonstrate crea-

tivity and originality that rises to the level of artistry." *Freeman,* 846 F.Supp. at 1157. In holding them non-exempt, the district court found that the plaintiffs' work was "predominantly 'functional in nature,' in that it depends primarily upon acquired skill and experience and does not depend to a sufficient extent upon invention, imagination or talent to qualify for exemption as the work of an 'artistic' professional." *Id.* (citation omitted). However, we believe that the functional nature of their positions as thus defined in no way rendered them insufficiently creative to qualify for exemption as artistic professionals. To the contrary, the evidence as a whole plainly demonstrates that plaintiffs are exempt from the overtime provisions as professional employees.

■ We believe that the district court erred in finding that Freeman, Brown, and Garner do not qualify as professionals by relying on a DOL interpretation of the artistic professional exemption which is non-binding, outdated, and inapplicable to the present case. The DOL interpretation, 29 C.F.R. § 541.302(a) ("Interpretation 302")[2], pertains to a different provision of the regulation, known as the "long test," which applies only to employees whose weekly salaries are less than $250 but at least $170. Under the long test, an employee is an artistic professional if

(1) the employee's primary duty consists of the performance of work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee;

(2) the work requires the consistent exercise of discretion and judgment in its performance;

(3) the work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such a character that the output produced or the result accomplished cannot be stan-

dardized in relation to a given period of time; and

(4) the employee not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in paragraphs (a) through (c) of this section.

*See* 29 C.F.R. §§ 541.3(a)-(d), 541.302(a).

Interpretation 302, which specifically notes that writing is "a recognized field of artistic endeavor" that may qualify for exemption, 29 C.F.R. § 541.302(b), states:

Another requirement is that the employee be engaged in work "the result of which depends primarily on the invention, imagination, or talent of the employee." ... In the case of newspaper employees the distinction here is similar to the distinction observed ... in connection with the requirement that the work be "original and creative in character." Obviously the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on "invention, imagin[ation], or talent."

29 C.F.R. § 541.302(d). In relevant part, 29 C.F.R. § 541.302(f)(1) provides:

Newspaper writing of the exempt type must ... be "predominantly original and creative in character." Only writing which is analytical, interpretive or highly individualized is considered to be creative in nature.... Newspaper writers commonly performing work which is original and creative within the meaning of § 541.3 are editorial writers, columnists, critics, and "top-flight" writers of analytical and interpretative articles.

■ Unlike regulations, interpretations are not binding and do not have the force of law. 29 C.F.R. § 775.1; *see also* 29 C.F.R. § 790.17(c); *Sherwood v. Washington Post,* 871 F.Supp. 1471, 1481 (D.D.C.1994). The interpretations, which are not promulgated pursuant to the requirements of the Administrative Procedure Act, "are not conclusive,

---

**2.** The interpretation relied on by Magistrate Judge Roberts as § 541.303 was redesignated in 1992 as § 541.302. 57 Fed.Reg. 46742, 46744 (1992).

even in the cases with which they directly deal." *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1070 (1st Cir.1995) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)). Thus, although they are entitled to some deference, the weight accorded a particular interpretation under the FLSA depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164; *see Reich v. New York*, 3 F.3d at 587 ("the respect accorded the Secretary's *interpretive* regulations depends upon their persuasiveness").

Giving due consideration to these factors, we conclude that, in the present case, Interpretation 302's " 'power to persuade' is meager indeed." *Sherwood*, 871 F.Supp. at 1481. Because Interpretation 302 is non-binding, refers only to the long test and not to the short test, and is out-of-date, we accord it little weight. To hold otherwise would both contravene the short test and produce a result incongruous with the purposes of the FLSA.

First, Interpretation 302's validity is diminished by the fact that it provides guidance strictly for applications of the long test. Although Interpretation 302 was promulgated in 1949, the same year the short test was added to the regulations, it was conceived six years earlier as is apparent from its paraphrasing, and exact duplication in parts, of an interpretation of the regulation contained in a 1943 Labor Department enforcement release entitled the "Manual of Newspaper Job Classifications," Wage & Hour & Public Contracts Division, U.S. Dep't of Labor (April 1943); *see* 14 Fed.Reg. 7705 (1949). Indeed, the Secretary's journalism interpretations "have not changed in any material respect since 1949, long before the newspaper industry evolved into its current form." *Newspapers of New England*, 44 F.3d at 1071.

More importantly, Interpretation 302 discusses requirements of the long test which are not part of the short test. Overall, the short test is a "simpler and more inclusive

test [that] requires only that the employee's primary duty consist of 'work requiring invention, imagination, or talent in a recognized field of artistic endeavor.' " *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 698 (3d Cir.1994) (quoting 29 C.F.R. § 541.3(e)). "Although the two tests are similarly worded, a few differences make the long test substantially harder to meet than the short test." *Sherwood*, 871 F.Supp. at 1479. To qualify for exemption, the short test eliminates several requirements that must be met under the long test:

1. The long test requires proof that the results of the employee's work depend "primarily" on the employee's "invention, imagination, or talent." § 541.3(a)(2). The short test eliminates the "primarily" requirement and requires only that the "primary duty" be "work requiring invention, imagination, or talent in a recognized field of artistic endeavor." § 541.3(e).

2. The long test requires proof that work be "original and creative in character." § 541.3(a)(2). The short test does not.

3. The long test requires proof that an exempt occupation require "the consistent exercise of discretion and judgment." § 541.3(b). The short test does not.

4. The long test requires proof that exempt work be "predominantly intellectual and varied in character." § 541.3(c). The short test does not.

5. The long test contains a quantitative requirement that at least eighty percent of the employee's time be spent on qualifying work. § 541.3(d). The short test does not.

These differences between the long test and the short test are significant; not only do they make the long test more difficult for the employer to meet but they also illustrate that Interpretation 302 guides only applications of the long test. In concluding that Interpretation 302 applies only to the long test and not to the short test as well, we part company with the First and Third Circuits. *See Gateway Press*, 13 F.3d at 700–01 n. 18 (declining to limit application of Interpretation 302 to

the long test); *Newspapers of New England,* 44 F.3d at 1075 n. 10 (same).

Although the magistrate judge recognized some of the distinctions between the two tests in the regulation, she was ultimately persuaded by her own belief that "originality and creativity are unquestionably among the defining characteristics of 'artistic endeavor,' and of 'invention, imagination or talent' in writing." *Freeman,* 846 F.Supp. at 1155 n. 123. The district court based its analysis largely on *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1229 (5th Cir.1990), in which the Fifth Circuit found that television news producers were not exempt from FLSA coverage because the employer failed to prove that the producers' work was a product of their "invention, imagination, and talent" and any discretion the producers possessed was "governed more by skill and experience than by originality and creativity." In relying on Interpretation 302 and *Dalheim,* which apparently also relied on Interpretation 302, the district court held, in substance, that an artistic professional's work must be both "original and creative" to satisfy the short test. *Freeman,* 846 F.Supp. at 1155 (citing 29 C.F.R. § 541.303(a)). As demonstrated above, however, unlike the long test, *see* 29 C.F.R. § 541.3(a)(2), the short test does not require that work be "original and creative in character." To the extent that the district court imputed definitional elements of the long test to the short test by relying on Interpretation 302, it committed an error of law.

Second, we believe that the persuasive power of Interpretation 302 is considerably weakened by its questionable continuing validity in light of the changing landscape of major, modern news organizations. Dizzying technological advances and the sophisticated demands of the news consumer have resulted in changes in the news industry over the past half-century. This is particularly true of television news where the same news may be communicated by a variety of combined audio and visual presentations in which creativity is at a premium. Yet, over this period, the DOL has failed to update the journalism interpretations. In present day news reporting, a fundamental difference exists between journalists who work at major news organiza-

tions and small town news reporters. *See Sherwood,* 871 F.Supp. at 1482. Thus, although the 1949 interpretation with its 1943 origins may still apply to small town reporters whose responsibilities do not differ much from those of 1949–era journalists, it is anachronistic, even irrational, to continue to impose these guidelines on many journalists in major news organizations. Because the journalism interpretations failed to consider the importance of this distinction, the rationale for judicial deference to them is undermined.

Freeman, Brown and Garner argue that two recent opinions by the Third and First Circuits, *Reich v. Gateway Press, Inc.,* 13 F.3d 685, and *Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, respectively, "uphold[ ] the interpretations against a challenge to their age." This characterization is misleading. These courts never concluded that the age of the interpretations was of no moment; rather, they upheld their applicability to the particular facts of each case before them, notwithstanding the interpretations' age.

In *Gateway,* the Third Circuit held that Interpretation 302 governed the exempt status of reporters working for small, suburban community newspapers. The court emphasized, however, that the plaintiffs-reporters spent a majority of their time "rewriting press releases, attending municipal, school board and city council meetings, interviewing people, answering phones, and typing wedding announcements, school lunch menus, business reviews, real estate transactions, and church news." *Gateway,* 13 F.3d at 699. The court held that these tasks did not "require any special imagination ... at making a complicated thing seem simple, or at developing an entirely fresh angle on a complicated topic." *Id.* at 700. Significantly, the Third Circuit suggested that it might well reject the application of Interpretation 302 to the type of journalists we find in this case:

> [W]e do not mean that all gathering of facts is necessarily nonexempt work.... But we believe that the type of fact gathering done by the Gateway reporters is not the type of fact gathering that demands the skill or expertise of an investigative

journalist for the *Philadelphia Inquirer* or *Washington Post*, or a bureau chief for the *New York Times*. ...

[I]f we were to find that the Gateway reporters are in the minority of reporters whose primary duty requires invention, imagination or talent, it is hard to see what reporters would be left in the majority.

*Id.* at 700; *see also Newspapers of New England*, 44 F.3d at 1075 (finding that reporters working for small newspaper in Concord, New Hampshire, were non-exempt but noting that its decision "should not be read to mean that all journalism work is nonexempt"). Unlike the newspaper journalists in *Gateway* and *Newspapers of New England*, whose roles closely resemble those of the paradigm 1940's-era journalist, the plaintiffs in the present case are "writers and producers at the pinnacle of accomplishment and prestige in broadcast journalism," whose talents far surpass those of journalists who work for local newspapers or smaller television stations. *Freeman*, 846 F.Supp. at 1123.

Third, the district court's conclusion is contrary to the purposes of the FLSA. As acknowledged by the district court, the FLSA was intended, *inter alia*, to prohibit substandard labor conditions. *Freeman*, 846 F.Supp. at 1112 (citing *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981)). In 1938, during the Great Depression, Congress enacted the FLSA to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a); *see Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 902 n. 18, 89 L.Ed. 1296 (1944) (Congress intended the FLSA "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."). The FLSA is properly considered a shield to protect unwary workers; it is not a sword by which writers and producers at the pinnacle of accomplishment and prestige in broadcast journalism may obtain a benefit from their employer for which they did not bargain. Thus,

while the plaintiffs should not be exempted solely on the basis that they are well paid, we think that the DOL interpretative guidelines should be read in an effort to promote the FLSA's purpose, not to frustrate it.

Fourth, our reading of the provisions in question is supported by the history of their development. The exemption provision, which initially limited the "professional" exemption to "learned" professionals (i.e., those whose occupations were "based upon educational training in a specialized organized body of knowledge"), has been expanded over time. *See* 3 Fed.Reg. 2518 (1938). The "artistic" professional exemption was added to the regulation in response to a 1940 Labor Department Report. *See* U.S. Dep't of Labor, Wage & Hour Division, " 'Executive, Administrative, Professional ... Outside Salesman' Redefined," at 40 (1940) ("1940 Report"); 5 Fed.Reg. 4077 (1940); 29 C.F.R. § 541.3(a)(5)(ii) (1940 ed.); 29 C.F.R. § 541.3(a)(2) (current provision). The 1940 Report specifically recognized that the artistic professional exemption would include "persons holding the more responsible and better-paid positions in the editorial departments of newspapers or in advertising agencies." 1940 Report at 41.

Recognizing that salary level is a "good proxy" for determination of professional status, the Department of Labor added the short test to the regulation in 1949. *Reich v. Gateway Press, Inc.*, 13 F.3d at 698 n. 16. Under the short test, more highly-paid workers would not have to meet the detailed criteria of the long test in order to be exempted as "artistic professionals." The Department of Labor explained the amendment:

[The Department of Labor's] experience ... has shown that in the categories of employees under consideration the higher the salaries paid the more likely the employees are to meet all the requirements for exemption, and the less productive are the hours of inspection time spent in analysis of the duties performed. At the higher salary levels in such classes of employment, the employees have almost invariably been found to meet all the other requirements of the regulations for exemption.

U.S. Department of Labor, Report and Recommendations on Proposed Revisions for Regulations, Pt. 541 at 22 (1949). Although salary is not the principal ingredient in determining exemption status, it is in the mix of ingredients. The plaintiffs' relatively high salaries suggest that they are the type of employees Congress intended to exempt from FLSA coverage.

In sum, we reject Interpretation 302's categorical conclusion that "[t]he reporting of news . . . must be considered as nonexempt work." Because we find that the plaintiffs qualify as artistic professionals, we hold that they are exempt from the FLSA's overtime provisions and that their fees therefore should not be included in their "regular rate" from which overtime pay is calculated.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court.